**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Frank G. D'Amico, being duly sworn, depose, and state as follows:

**I.   INTRODUCTION**

1. From September 22, 2002, to the present, I have been employed as a Special Agent for the Federal Bureau of Investigation (FBI), U.S. Department of Justice. Prior to September, 2002, I was employed as a federal officer for the U.S. Pretrial Services Agency for the United States District Court, District of New Jersey, for a five year time period. I am currently assigned to the FBI's Washington Field Office and stationed at the Northern Virginia Resident Agency. My primary duty as a Special Agent is to investigate allegations of public corruption and fraud against the government. As a Special Agent, I have received specialized investigative training at the FBI Academy in Quantico, Virginia, and conducted a number of criminal and counterintelligence investigations. I also hold a Masters Degree in Criminal Justice and Forensics from The George Washington University in Washington, D.C.

2. The facts and information contained in this Affidavit are based on my personal knowledge and observations; my review of records and documents obtained during this investigation; information received from other individuals, including witnesses and members of the U.S. Federal Election Commission's ("FEC's") Office of Inspector General; and my experience and training as a Special Agent of the FBI. This Affidavit does not set forth all information known to the FBI about this case and is being submitted solely for the purpose of providing sufficient information to establish probable cause in support of this application.

II.     **PREMISES TO BE SEARCHED**

3.      Based upon the investigation described below, I submit that the facts set forth in this Affidavit establish probable cause to believe that evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Section 208 (Conflict of Interest) and Title 18, United States Code, Section 1001 (False Statements) are being kept and concealed within the offices and computers of James A. Pehrkon, John C. O'Brien, and Lola Hatcher-Capers, which are described more fully in Attachment A hereto.

III.    **FACTS AND CIRCUMSTANCES**

4.      Since October, 2005, the FBI has been conducting an investigation of Pehrkon because of his efforts to secretly obligate and spend FEC funds to settle an employment discrimination claim alleging, among other things, that he had created a hostile work environment for a female subordinate. As described more fully below, and in violation of FEC administrative policy, Pehrkon officially represented the FEC's financial interests in the settlement stage of the Equal Employment Opportunity ("EEO") resolution process, negotiated cash settlements payable by the FEC to the victim and her attorney, failed to notify the FEC's Commissioners of either the allegations or the settlement offers, and caused others to submit disguised procurement requests to obligate FEC funds for the settlement. In so doing, Pehrkon concealed from his supervisors information that could have jeopardized his employment with the FEC.

5.      The FEC is an independent regulatory agency created by Congress that is responsible for enforcing the Federal Election Campaign Act (FECA), a federal statute governing federal election campaign finance. The FEC is overseen by a panel of six presidentially appointed Commissioners (hereafter the Commission) who are responsible for formulating agency policy. The Commission

has statutory authority to appoint and retain a Staff Director, who serves as the FEC's Chief Operating Officer and oversees the agency's three operational divisions (Management & Budget Division, the Information Technology Division, and the Audit & Review Division), as well as several FEC offices, including the Office of Personnel and Labor Relations and Equal Employment Opportunity. Since April 4, 1999, James A. Pehrkon has served as the FEC's Staff Director. Before he was appointed as FEC Staff Director, Pehrkon served as the FEC's Deputy Staff Director and Chief Financial Officer for eighteen years. Among the employees that Pehrkon directly supervises are: (1) Lola Hatcher-Capers, the FEC's Equal Employment Opportunity Director; and (2) Anthony P. Scardino, the Deputy Staff Director and Chief Financial Officer who oversees the FEC's Management and Budget Division. Scardino, in turn, supervises John O'Brien, the FEC's long-time Budget Officer.

6.      On or about June, 2005, a female employee of the FEC whose identity is known to the FBI and who is referred to herein as W-1, contacted Hatcher-Capers to report an allegation of employment discrimination against Pehrkon. During the meeting, Hatcher-Capers told W-1 that her identity would be kept confidential, but also stated that she needed to inform the Commission of W-1's complaint against Pehrkon. This was because Pehrkon reported to the Commission and FEC policy required the EEO Director inform an employee's immediate supervisor if the employee is accused of employment discrimination. Days later, Hatcher-Capers informed W-1 that she had decided not to notify the Commission of Pehrkon's alleged discrimination and refused a subsequent request by W-1 to so notify the Commission. It is unclear at this time what further action, if any, Hatcher-Capers took in response to W-1's complaint and whether Pehrkon, to whom Hatcher-Capers reports, unduly influenced her not to notify the Commission of W-1's allegations against him.

Hatcher-Capers also informed O'Brien of the informal complaint W-1 had made to Hatcher-Capers against Pehrkon. O'Brien was W-1's direct supervisor and is known to be a close friend of Pehrkon's.

7. On or about August 22, 2005, W-1 filed a formal EEO complaint against Pehrkon alleging on-going employment discrimination. The EEO complaint also named Hatcher-Capers for breaching W-1's confidentiality by informing O'Brien of the informal complaint.

8. In response to the formal complaint, Hatcher-Capers contracted with Debra Alexander of Alexander Consulting & Training Incorporated (ACT) to assist with the formal EEO process. ACT's role was to conduct appropriate EEO counseling and serve as an independent mediator during resolution negotiations. The contracting of ACT also allowed Hatcher-Capers to recuse herself from the EEO process once she learned that she had also been named in the victim's formal complaint. The FEC paid ACT a fee for these services.

9. On September 14, 2005, Pehrkon met with Scardino, the FEC's Chief Financial Officer. During this meeting, Pehrkon advised Scardino that he hoped to settle a pending EEO suit with a cash settlement of approximately $100,000.00. Pehrkon told Scardino that he wanted to use surplus budgetary funds for fiscal year 2005 to fund any such settlement. Pehrkon also disclosed that he wished to have the funds procured in a manner which would prevent the Commission from learning about the expenditure.

10. On September 15, 2005, negotiations were held to address W-1's EEO complaint against Pehrkon and Hatcher-Capers. Present at this meeting was W-1, Pehrkon, Alexander, and John P. Mahoney, who is a partner in the Law Firm of Mahoney and Mahoney and W-1's retained counsel. During this meeting, Pehrkon apologized to the victim and offered a preliminary settlement on

behalf of the FEC. This proposed settlement consisted of a $100,000.00 cash award, payment of reasonable attorney fees, and a promise of no further harassment or retaliation. Pehrkon informed the interested parties that he would need to speak to his Chief Financial Officer and Budget Officer to see if this proposed settlement could be honored.

11.     Later that day, Pehrkon held another meeting with Scardino. During this meeting, Scardino informed Pehrkon that he would not allocate $100,000.00 towards the EEO settlement without the approval of the Commission. Scardino also advised Pehrkon that he was aware of the fact that he was an interested party in the EEO matter under review and his participation in the negotiation was a direct conflict of interest. I have reviewed the FEC's written EEO procedures and confirmed that, in accordance with those procedures, if the Staff Director is named in an EEO complaint, then the Staff Director is not authorized to enter into settlement negotiations concerning the complaint.

12.     On September 30, 2005, Pehrkon called a second resolution hearing to re-address the terms proposed during the September 15, 2005, meeting. Present at this meeting was W-1, Alexander, Pehrkon, and Mahoney via telephone. Pehrkon informed all parties that he did not possess the authority or agency resources to honor a $100,000.00 cash settlement, but that non-cash awards could be offered. Pehrkon subsequently offered W-1 enhanced mentoring and training opportunities, as well as payment of her incurred legal fees.

13.     Later that day, Pehrkon informed Scardino that he needed to have $10,000.00 in fiscal year 2005 budgetary funds allocated for payment to Mahoney and Mahoney to satisfy part of the EEO settlement under negotiation. Pehrkon further advised that the procurement request should identify Mahoney and Mahoney's services as "EEO consultation" as opposed to "incurred legal fees". Scardino refused to honor Pehrkon's request and advised O'Brien, the FEC's Budget Officer who

allocates the FEC's financial resources, of his decision.

14.	Nonetheless, prior to the close of business on September 30, 2005, O'Brien approved a procurement request obligating $10,000.00 in fiscal year 2005 budgetary funds payable to Mahoney and Mahoney. According to procurement documents that purported to be authorized by O'Brien, the services provided by Mahoney and Mahoney consisted of "EEO services and consultation for the period of 09/01/2005 to 09/30/2005." O'Brien was listed as the requesting official for this procurement request and acted as the approving authority by signing the document as both the Office Head and Budget Officer.

15.	O'Brien's name also appears on a Statement of Work (SOW) for Consultative Services that corresponds to the aforementioned procurement request. This SOW authorized payment to the contracted vendor in exchange for providing EEO consultative services for "one or more accepted issues for complainant(s) relating to allegations of discrimination, sexual harassment, and/or retaliation." The SOW identifies O'Brien as the point-of-contact in this procurement process stating reasons that were unique to this specific matter.

16.	Investigation has determined that Mahoney and Mahoney is not under contract with the FEC to provide any form of EEO consultative services. Furthermore, Mahoney and Mahoney has not invoiced the FEC for payment of legal fees. Both the procurement document requesting payment to Mahoney and Mahoney for EEO consultative services and the accompanying SOW are, therefore, false claims for payment.

17.	It is noted that September 30, 2005, was the last day of fiscal year 2005. As such, any agency funds not obligated by close of business on that day would have been returned to the U.S. Department of Treasury. It is also noted that these funds were obligated from surplus funds

associated with the FEC's Office of Budget, Planning, & Management and not the FEC's EEO Director's Office, which is run by Hatcher-Capers. Through the nature of his position, O'Brien holds direct control over budgetary funds associated with the FEC's Office of Budget, Planning, & Management.

18.     On October 4, 2005, the FEC's Office of Inspector General advised the Commission of possible criminal and administrative wrong-doing by Pehrkon, O'Brien, and Hatcher-Capers. Upon receiving this notification, the Commission placed Pehrkon, O'Brien, and Hatcher-Capers on administrative leave pending a full investigation. All three individuals were subsequently escorted from FEC office-space located at 999 E Street NW, Washington, D.C.

19.     Upon being notified of the Commission's disciplinary actions, the FEC's Office of Inspector General immediately sealed-off Pehrkon's, O'Brien's, and Hatcher-Capers' respective offices and seized their government-issued laptop computers in effort to preserve any evidence of a crime.

20.     Based upon the foregoing, there is probable cause to believe that violations of Title 18, United States Code, Section 208 (Conflict of Interest) have been committed by Pehrkon and others. Specifically, there is probable cause to believe that Pehrkon "participate[d] personally and substantially as a Government officer or employee . . . in a controversy, charge, [or] accusation . . . in which, to his knowledge, he . . . . ha[d] a financial interest," to wit, the attempted secret obligation of FEC funds and settlement negotiations concerning an employment discrimination claim that could have resulted in the loss of his job. It is reasonable to conclude that evidence, fruits, and instrumentalities of this violation will be found in the offices of Pehrkon, O'Brien and Hatcher-Capers, as described more fully in Attachment A hereto, and also on the computers that have been issued to them by the FEC and that are also described more fully in

Attachment A hereto.

21. Based upon the foregoing, there is also probable cause to believe that violations of Title 18, United States Code, Section 1001 (False Statements) have been committed by O'Brien and others. Specifically, there is probable cause to believe that O'Brien, acting at Pehrkon's request, signed a false procurement request intended to obligate FEC funds to pay W-1's lawyer for legal expenses under the guise of "EEO services and consultation" when, as O'Brien and Pehrkon then well knew, W-1's lawyer had not provided any EEO services or consultation to the FEC. It is reasonable to conclude that evidence, fruits, and instrumentalities of this violation will be found in the offices of Pehrkon, O'Brien and Hatcher-Capers, as described more fully in Attachment A hereto, and also on the computers that have been issued to them by the FEC and that are also described more fully in Attachment A hereto.

## IV.    ELECTRONIC EVIDENCE

22. Based upon my knowledge, training and experience, and consultations with computer forensic examiners, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

   A.    *The volume of evidence*. Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting

process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

   B. <u>Technical requirements</u>.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.  In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

23. Based upon my knowledge, training and experience, and consultations with forensic computer examiners, I am aware that searching computerized information for evidence or instrumentalities of a crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and date security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.  This is true because the peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.  Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In

addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

24. If, after inspecting the I/O devices, software, documentation, and data security devices, the analyst determines that these items are no longer necessary to retrieve and preserve the date evidence, the government will return them within a reasonable time.

25. Data analysts may use several different techniques to search electronic data for evidence or instrumentalities of a crime. These include, but are not limited to, the following: examining file directories and subdirectories for the list of files they contain; opening or reading the first few pages of selected files to determine their contents; scanning for deleted or hidden data; and searching for key words or phrases ("string searches").

26. This specifically excludes a search of any kind of unopened electronic mail, and no warrant is herein sought for such unopened electronic mail. If unopened electronic mail is to be searched, a separate warrant will be sought supported by probable cause.

27. I swear that all of the above information is true and correct to the best of my knowledge belief.

_____
Frank G. D'Amico, Special Agent
U.S. Department of Justice
Federal Bureau of Investigation

Sworn to and subscribed before, this _____ day of _____, 2005

_____

UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A – PREMISES TO BE SEARCHED**

    a. office-space occupied by James A. Pehrkon at the U.S. Federal Elections Commission and identified as Room 935 on the 9th floor of 999 E Street NW, Washington, D.C. 20463.

    b. office-space occupied by John C. O'Brien at the U.S. Federal Elections Commission and identified as Room 819-G on the 8th floor of 999 E Street NW, Washington, D.C. 20463.

    c. office-space occupied by Lola Hatcher-Capers at the U.S. Federal Elections Commission and identified as Room 507-A and Room 507-B on the fifth floor of 999 E Street NW, Washington, D.C. 20463.

    d. a government-owned Dell laptop computer issued to and known to be used by James A. Pehrkon, an employee at the U.S. Federal Elections Commission.

    e. a government-owned Dell laptop computer issued to and known to be used by John C. O'Brien, an employee at the U.S. Federal Elections Commission.

    f. a government-owed Dell laptop computer issued to and known to be used by Lola Hatcher-Capers, an employee at the U.S. Federal Elections Commission.

**ATTACHMENT B**

<u>Items To Be Seized</u>

Any and all documents in electronic form or otherwise, including but not limited to notes, memoranda, or opened e-mail, that relate or refer to either (1) W-1's allegations of employment discrimination against Pehrkon; (2) any settlement negotiations, offers or discussions, whether formal or informal, concerning the resolution of W-1's allegations of employment discrimination against Pehrkon; and (3) the obligation and/or disbursement of funds to either W-1 or her attorney in connection with her allegations of employment discrimination against Pehrkon.